Good morning, Your Honors. Rochelle Wilcox for Appellant Geysers Power Company. I'd like to reserve two minutes for rebuttal, please. All right. Watch your time. Thank you, Your Honor. In 1955, Lessor granted broad sole and exclusive rights to Geysers Power's predecessor, conveying every right Lessor possessed to exploit the vast geothermal reserve known as the Geysers. The plain language of the lease and the rights expressly granted give Geysers Power the, quote, sole and exclusive right to decide, end quote, to decide what is built on the land to exploit or facilitate the exploitation of that reserve. To reiterate their point that sole and exclusive means sole and exclusive, the parties concluded, and this is in the record at 227, with a clear statement of their intent. The possession by Lessie of said land shall be sole and exclusive for the purposes hereof and for purposes incident or related thereto. Lessor then reserved narrow defined rights, a few narrow areas in which it could use the property, and stated those uses shall be carried on subject to and with as little interference as is reasonably possible with the rights and operations of Lessie hereunder. So typically, though, courts construe mineral leases against the Lessie, right? Don't we start with that proposition? There are cases that have said that, correct. So it seems to me, I mean, I'm calling you your, I'm going to call you Geyser and then the other, or GP and the others GDP, I guess, or whatever. But it seems that you also, not only your rights as the Lessie, but you want to say that you have the rights to consent to any easements. Is that right? Not just any easements, Your Honor. Any easements that facilitate the exploitation of the geothermal reserve. And we think that the lease, regardless, even if the lease is construed narrowly as against the Lessie, the parties expressly chose broad and inclusive language, and they reiterated that language by making clear that not only does the Lessie have sole and exclusive rights to do anything identified in the lease, and we think that the lease expressly covers profiting from the exploitation of the reserve. And I'll get to that in just a moment. Well, how would the easement itself, this is I'm having as opposed to, say, the neighboring plant, impact the steam reservoir? How would it impact Geyser Power's extraction operations on GDP's land? Well, you have to understand the nature of the right that is conveyed. Under California law, it's known as a profit a prendre. The lessor, GDP, gave to Geyser's Power its right to exploit the reserve. It gave to Geyser's Power. On that property. Well, we disagree. We understand that that is what the trial court found. But the nature of the reserve is that all of everything below it migrates and transfers because of the nature of geothermal rights. And so the right to exploit the reserve means that they sold their right to the reserve. And I think a couple of cases are really helpful in pointing that out. But GDP doesn't even have a right to the reserve. It sold us its right to the reserve. But what it's claiming is that. But they don't own the reserve, right? They own the right to exploit the reserve. To exploit to whatever they can get out of it. But they still don't. No one owns it, right? It is. It's a right. It's like belongs to the world or whatever. Well, whoever can access the minerals and its liquid minerals underneath the reserve. And so what they. Judge Bolton had a question. Well, you agree that no one, that your client, Geyser Power, cannot stop the neighboring lessee from exploiting the reserve by drilling on the neighboring land. Yes, that is a different issue, though, because. But that's not a different issue from the point of view of the trial judge who said you can't stop it from happening. So just allowing the transmission is something different. It's a commercial use. Well, I mean, we certainly disagree with the construction of commercial. But it is fundamentally different to allow a separate entity with no relationship whatsoever with this property at issue to drill. And it's the trial court's conclusion that that exploitation is going to go forward as it is planned, regardless of what happens on this property. It really, we think, resolved a question of fact that should not have been resolved on summary judgment. There is. The record says it's not. You say in your brief you will offer more extensive evidence. If we reverse summary judgment, what evidence are you talking about? Because it seems like it's just interpretation of the contract. Well, we think that the contract should firmly. And it does clearly support us. But there are several questions of fact. For example, we think the trial court resolved disputed issues of fact related to course of dealing against us. Instead of giving us the benefit of the doubt, so to speak, instead of resolving inferences in our favor, as the court was required to do on summary judgment, the court said that course of dealing does not, I forget the language, but it does not support us, meaning that the court found ambiguity and so rejected our argument and said that we haven't established course of dealing. But there was evidence in the record to support our argument that a course of dealing shows that the parties recognized that we have these rights. There was a series of. Well, but I think didn't the district court, the district court took a peek under the pillow, a peek under the covers and looked at all that and said, I can't really sort this out exactly. It doesn't really. The GDP said it said certain things. You said certain things. And there didn't seem to be a 100 percent course of dealing. And that is why the court erred, because the court is required to accept inferences in our favor. But if it's not ambiguous, then you don't even get to that point, right? That's correct. If it's not ambiguous, we don't get to that. We do think, though, in that way and others, questions about what interference is contemplated by the lease. The court concluded, basically, that you take a parcel of land and you just treat it as if it's kind of 90 degrees, you know, up and down, and everything underneath that is what is captured by. I have a question about the geyser in terms of geyser power has many other steam extraction wells in the area. How does that factor into our analysis? In other words, how isn't geyser power itself guilty of engaging in the behavior that negative impacts the other party's right to contractual benefits? Because the parties contemplated that geyser power would have extensive property, that it would be drilling a lot of wells in the property. This is reflected in the lease itself. So you can do what they can't do, is what you're saying. Yes, absolutely. Under the plain language of the lease. And it's not unclean hands. No, not at all. It is reflected in the language of the lease at 227 where the parties talk about byproducts from the vicinity, about steam and byproducts from the vicinity. It's clear that the parties contemplated that geysers power would be drilling wells all throughout the reserve. So what if instead of giving an easement for power lines, geyser development just gave the neighboring property, let's see, an easement to bring all of the equipment over geyser development's land to develop the neighboring site? It is our position that they cannot profit from exploitation of the reserve. And we think that that is clear from the language of the lease and from California law. And I would like to point the Court to a couple of cases that we think really make this point. Well, Counsel, before we do that, would you agree that the lease is silent concerning whether your client, whether the lessor must contain your client's express consent prior to granting easements on the property? The lease does not explicitly address that point, does it? Not that specific point, but what it does is it gives us sole and exclusive rights to exploit the property, to take steam from the property, And as a literal matter, exploitation of the reserve on a neighboring property is taking steam from the property. That's why in the record at 100 to 101, the letter from that competing geothermal producer, that letter reflects the contemplation of the parties that our steam will be reduced. So our steam will – Doesn't the record reflect that there had been prior exploitation of the adjoining property, and this was just a plan by a lessee to redevelop it, to start it up again? That is – There is – The record does reflect that PG&E in the past had exploited that. What's not clear, and that's why this is an issue for the jury, because it's not clear whether or not that was done with Geyser Power's  Some of the cases that are in the – or Geyser Power's predecessor's consent, PG&E had broad rights to drill wells and to exploit the reserve in the 50s and 60s when this started. And so there's a lot of questions about the history and what exactly was done by the parties over the course of this lease. Well, doesn't that raise a question, a legitimate question, as to whether or not the consent of the lessee was required before easements could be granted? If those easements had been granted previously without consent. Doesn't that raise a legitimate question that the course of dealing upon which your client relies is not sufficient to raise the question of ambiguity? We have offered evidence to establish our argument as to the course of dealing, and the trial court resolved ambiguities against us. If the evidence goes both ways in terms of course of dealing, then under California law, the court is entitled to say as a matter of law that there is not sufficient in this issue of ambiguity and that there's not sufficient evidence that the interpretation that you urge the court is supported by the evidence. Well, there would have to be very minimal evidence, we contend, under California law to say that there is insufficient evidence to support a jury verdict in our favor. Or a verdict by the fact finder in our favor. And that's really the question. We have presented evidence of course of dealing that supports our position. The trial court rejected that evidence and reached basically a conclusion of fact against us. It effectively held that we didn't conclusively establish this. Isn't it more fair to say that the court said that it interpreted the contract and then considered whether or not the course of dealing evidence affected its ruling on the contract. That is correct. It was not weighing the evidence against one or the other. It was just saying, here's my interpretation of the contract. Now I'll look at what you've presented me to see whether or not my interpretation of the contract should be changed. So that's not weighing the evidence. It's not ruling in favor of one party or against another party. It's just confirming whether or not the interpretation adopted by the court is correct. I mean, we think that the court's analysis went in two steps. One is the lease unambiguous. And the court held that it is unambiguous. We think the court erred in that. And the court peeked under the sheets and looked under the covers and said, this doesn't change my mind. And we do the same in construction all the time. Sure. We say it's not ambiguous. This is what it says. But okay. We'll go ahead and look. You didn't change my mind. Sure. Understood. Our point is that the court misinterpreted the contract. And that, of course, is an issue of law. And we, you know, I would like to point out, point the court to a couple of cases that really, that identify the nature of the rights that are granted. Did you maintain ambiguity down below? You did not, did you? Well, so it was cross motions on summary judgment. We think that under the. The contract said was unambiguous, right? We think, though, under the circuit's law, that it's clear that this issue was adequately raised below, in part because the trial court resolved it. And that certainly, I see that I have less than two minutes. If I should reserve that. You talk really fast, so you probably already talked for 30 minutes. I have a couple of cases I really want to point the court to. I will do that on rebuttal. All right. Thank you, counsel. Thank you. Good morning. May it please the court. Good morning. Good morning. Joel Westrick, appearing on behalf of Plaintiff and Appellee Geyser Development Partnership. This is a case about interpreting the words of recorded mineral lease. The text of the lease indicates a relatively straightforward approach. Does the contemplated easement have to do with steam extraction from the lessor's property? And would the contemplated easement interfere with lessee's use of the property? If the answer to those questions are no, then the lease, then the easement does not violate the terms of the lease. The fundamental problem with appellant's approach is that it's anything but straightforward. It requires that this court go beyond the four corners of the lease and read provisions into the lease that simply aren't there in the text. For instance, the lease applies to the entire geothermal reservoir and the geysers. There's no words in the lease to support that. Instead, the lease is very clear that it applies to our land, which is all the lesser could give. I'm curious. Has there been any pertinent development since the briefing in this case? Has Western Geopower, is they still building a plant next door? Is it still requesting an easement across the land? Your Honor, of course, that's not in the record. I know, but I'm just curious if it's moot or anything. The short answer to your question is I don't know that, but I can tell you that there's no agreement between geyser development and Western Geopower. The district court properly resisted going beyond the four corners of the lease, instead stayed within the four corners of the lease and interpreted its words according to its plain and ordinary meaning. That was looking at an easement for electrical transmission lines. As long as it does not relate to steam extracted from the lessor's property and as long as the electricity is generated from steam from somebody else's property, that doesn't violate the terms of the lease. The granting of an easement in exchange for money is a commercial activity under the plain and common sense definition of what a commercial is. The district court committed no error in reaching that conclusion and reading the contract. All of this is supported by the text of the lease itself. If you look at the recitals in the lease, the very first thing the lease says is the purpose of the lease is for steam extraction from lessor's property. It's important because the lease does hear what it does consistently throughout the document, which is it tethers itself, the steam extraction from lessor, and the steam extraction from lessor's property. Those are the two things the lease does. Well, you do have the, okay, we have to construe the lease to give effect to the party's intent. And so given that rule and given that GDP granted Geyser Power exclusive possession of the property for steam extraction, what's your best argument that the parties intended for Geyser Power to have to share the surface with a competitor? We gave them the exclusive right to extract steam from our land. The competitor is not extracting steam from our land. And if the parties had wanted to forbid us granting easements for power line transmissions, they could have put that expressly in the lease, but they did not. The lease is very careful in talking about their sole and exclusive possession to say that relates for the purpose of the lease. The purpose of the lease is steam extraction from our land. That's what the lease is designed to do. Well, what about, too, there's the Hancock Oil case. It's an older case, but California Court of Appeals appeared to hold that a landowner cannot authorize surface uses that cause drainage under leased land. And the court found that a third party well that bottomed on adjacent land interfered with the lessee's operations by draining oil from a common pool, thereby reducing the amount recoverable under the lease. Should that case or principle have any effect in our analysis? I don't believe so, Your Honor, because that case fundamentally involves slant drilling, which is not the issue here. The issue here is whether or not we can grant an easement for a power transmission line for steam that's not extracted from our property. And that's a completely separate issue, I think, than the issues were in that case, which, again, was the classic example where you're draining oil from somebody else's property by building a well that's relatively close to that. So, again, looking at the terms of the lease itself, the lease is clear on what the rights to the lessee are. It has a sole and exclusive right to extract steam from the lessor's property. The lessee then is also given the right to build facilities to extract that steam and is given the right to convert that steam into electric power and to distribute it. The lease is clear on that. The lease further goes on to say that they have the rights of right-of-way and a right to put up facilities. And this is where we get into that language regarding the vicinity of the property. That language clearly applies just to the byproducts of steam. They try to take a leap from that text to say that somehow the lease applies to the entire geysers, 40 square miles of the geysers. It clearly doesn't. But that link portion of the lease is saying, hey, they get the byproducts of steam on our property or if byproducts of steam migrate from other people's property, they get that too. In other words, yes. I guess, though, wouldn't it make – because the question concerns the reference to premises in the vicinity of the land. Factually speaking, wouldn't it make sense for that clause to apply only to steam byproducts and not to steam? What steam byproducts does the lease anticipate to be extracted? This is all very technical, I know. No, I appreciate that, Your Honor. In a way, that's two questions. The clause clearly only applies to steam byproducts because of the – it separates itself with the two fours that we pointed out in the lease. In terms of the steam byproducts, those are sulfates. They have minerals in them that can be ammonia, boron, arsenic, or things of that nature. So that's all that relates to. It's basically sulfates that come up as a result of extraction of the steam from the well. Again, you don't – it makes sense that the parties wouldn't want to have a conflict over where the byproducts may have originated from. So if it's on our land, then they get to have it clearly under the lease. But that's all that clause is saying. It's not somehow trying to expand the rights to the entire geothermal reservoir. Again, the only rights we can give them in that regard is to extract steam from our property. That's the limit of the right we could transfer in terms of mineral right, and that's what we gave them. It wouldn't apply to what other people are doing on other portions of their property. So, again, we now know what the purpose of the lease is and what the rights are. They have the sole and exclusive possession of the lease, but only for the purposes thereof or for purposes incidental and related thereto. And that language is very important because that clearly limits their rights under the lease to things that relate to steam extraction. They, for instance, couldn't make a use of the land that did not relate to steam extraction. And for the honor in that clause, the lessors reserved a very broader way of rights. I mean, it's grazing, horticultural, agricultural, all residential, and all commercial. That's extremely broad, and the district court correctly concluded that an easement exchange for money is commerce. And then you get to finally the last prong of the issue, which is particularly in the 1956 Amendment, the lessor's uses of the land trump the lessee's uses of the land. That's true. It is important, though, that the 1956 Amendment, contrary to what Appellant is trying to extrapolate from it, doesn't talk about sort of abstract concepts such as their profit or operations or things of that nature. But that portion of the lease says their use of the land. Again, we're tethering ourselves into the land. Their use of the land trumps the lessee. Now, this case is not about any particular easement. It's actually not directly about the Western Geo easement. But the application of our granting the easement to Western Geo kind of nicely demonstrates the analysis, which is the easement to Western Geo would be for electrical power line transmission. That does not relate directly to steam extraction from the lessor's property. We put into the record, and Appellant did not contravene this, that that easement would be through a portion of the lessor's land that the lessee is not using. So that would not interfere with lessee's use of the land. Under the analysis I suggested at the very beginning of my argument, that doesn't violate the terms of the lease. And honestly, this Court could stop there, as did, frankly, the district court, because it just applied the text of the lease to the situation and made a ruling. Both parties did submit extrinsic evidence to try to support a course in dealing. I think the criticism that Appellant has of the district court there is unfair. The district court did not engage in an exercise of weighing evidence or giving more credibility to some other's evidence or not. Instead, the district court correctly applied the two-prong test for considering extrinsic evidence in cases such as Brobeck, which is the court received extrinsic evidence, but the second prong is the court doesn't have to use that evidence to interpret the contract if the court believes the terms are ambiguous, which, by the way, both parties argued. I mean, Geiser's Power did not below argue to the district court that the terms were ambiguous, but they argued that that course in dealing supported their interpretation. The district court took a look at the evidence and said, no, this does not assist me with interpreting the words of this contract because they're plain and clear to me. Frankly, the most material extrinsic evidence that bore on this was the evidence that the lessor submitted, that in the past, Occidental Power, a competitor of the lessee, had operated a power plant near the lessor's property and the lessor had granted an easement to Occidental Power for electrical transmission line. That evidence, of course, directly bears on the issue here. In contrast, the evidence that Geiser Power submitted were six consent agreements for easements over a period of 63 years, and only four of those actually related to easements. The other two appear to relate to cleaning up toxic byproducts of steam. And the problem with those four consent agreements, as the district court found, is they appear to be completely unilateral. There was no evidence that Geiser's development consented to those, knew about them, or any context for them at all. Geiser Power submitted no evidence or testimony giving any context to these four easements. And the district court correctly looked at this and said, evidence of unilateral conduct isn't very good evidence, of course, of dealing, obviously, because there's no bilateral conduct between the parties. And considering that the parties had 63 years of dealings with each other, this was an extremely limited evidence showing an attempt to show coercion dealing by Geiser's power. And the district court correctly determined that that was not enough for them to change the interpretation of the contract. So when you take the text of the contract and this as a whole, you can really start seeing the weaknesses in Appellant's argument because Appellant essentially wants to read a no-compete clause into this lease. They essentially want to say that in no circumstances the lessor can make any deals, engage in any transactions, with anybody that is a potential competitor in the entire Geiser's reservoir, which is 40 acres. My client owns, excuse me, 40 square miles. My client owns less than 30 acres. Sorry, 3,000 acres, excuse me. So there's no no-compete clause in the lease. There's no words in the lease that say that. And as Justice Callahan pointed out before, Geiser's power is maintaining 105 leases throughout the Geiser, maintains 340 extraction wells that are outside our property, and have been competing with the lessor for years, doing exactly the same thing. The lessor complains of that Geiser's development might do, only we're not even going to do that. We can't control what a competitor such as Western Geo might do with their land. We have no control over that. We submitted evidence into the record that Western Geo could start extracting steam from their property regardless of any easement that Geiser's development were to provide to Western Geo, and that evidence was uncontroverted. So we can't control what somebody else is going to do with their land. They'd have to just go a different route to hook up, right? That is correct, Your Honor. But they can do that, and you can't stop them. We can only impact, obviously, our land, not somebody else's property. So if Western Geo does that, that still can affect the reservoir on GDP's property, right? Yes, Your Honor, as would be the case with anybody else other than Geiser's Power that would extract steam throughout the entire Geiser's. It would lower the steam. And obviously when Geiser's Power extracts steams from somebody else's property, that lowers steam that's underneath our property. So finally, Appellant tries to argue that sort of an abstract, that we can't affect their profit in any way. Again, there's no words in the lease to support that. In fact, the lease says it's for the mutual profit of the parties. Well, does it affect their profits? Because if Western Geo gets the transmission line, then it's cheaper for them to do what they do, and then they're more competitive with Geiser Power. Is that how it affects their profits? Is that what they argued, or what? I think they did argue that. I think they have a broader argument in general that anything that we might do with anybody else that owns any property in the entire Geiser's that could potentially negatively impact and would violate the terms of the lease, which is an extremely broad interpretation of the lease that isn't supported by the words. So I don't think their argument is necessarily limited to Western Geo. And again, I would point out that our action for declaratory relief wasn't about the Western Geo easement in particular. It was seeking the general right to be able to grant easements for electrical transmission lines without the consent of Geiser Power, as long as it doesn't involve extracting steam from the Western's property. Unless the Court has any questions, that's all I have for right now. All right. Thank you, Counsel. Thank you very much. Thank you, Your Honors. I'll try to go quickly. I do want to point the Court to a couple of cases that address the nature of the rights that were granted because we think it's critical that it's not just kind of gas in place or what is in place underneath the land. We were granted the right to profit, a profit a prendere. And if you look at Chandler, a case from 100 years ago, that was cited with approval in Callahan, which is the key California case on this, you see that it recognizes that. Callahan is 1935. It is, and that still is the case that defines the nature. Before I was born, yeah. That defines the nature of the rights that were granted. And in Chandler, the Court made clear that when Fearon, the landowner there, transferred its rights, it gave up the right to also exploit the reserve. It gave up the right to basically compete with the entity to which it had transferred rights. But at all is this competition. They're not exploiting the reserve. They're simply granting an easement for money. They are profiting from the exploitation of the reserve. Would it be different if they took a, if the deal had been for them to take some stock, if this was a publicly held company, and so they were partially owners but a small ownership piece, then they would literally own the company. But that's not what we have here. It's not. But the question is, the lease drew clear lines about what was given to us and what they withheld. And that's why their construction of commercial is so important because it demonstrates just how broadly they have to define that one word in order to reach the activity here. They have to contend that commercial means basically anything related to geothermal, so long as it's not their well that is actually pulling the property up, pulling the steam up. We understand your argument. Thank you so much. Thank you very much, Your Honor. Thank you to both counsel for your arguments in this case. The case just argued is submitted for decision by the court.
judges: Rawlinson, Callahan, Bolton